RESTLAND MEMORIAL PARK OF DALLAS, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 74–2054.

United States Court of Appeals, Fifth Circuit.

March 10, 1975.

Sam G. Winstead, William D. Jordan, Dallas, Tex., for plaintiff-appellant.

Frank D. McCown, U. S. Atty., Martha Joe Stroud, Asst. U. S. Atty., Ft. Worth, Tex., Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, Elmer J. Kelsey, Robert S. Watkins, U. S. Dept. of Justice, Tax Div., Washington, D. C., Eugene G. Sayre, Tax Div., Dept. of Justice, Dallas, Tex., for defendant-appellee.

Before AINSWORTH, GODBOLD and SIMPSON, Circuit Judges.

AINSWORTH, Circuit Judge:

This is a tax refund suit of Restland Memorial Park of Dallas [Taxpayer], a cemetery corporation, relative to federal income taxes paid under protest for the fiscal years ended June 30, 1965, 1966 and 1969, in the total sum of $86,095.62. At issue is whether the District Court correctly held that Taxpayer failed to qualify under Section 501(c)(13) of the Internal Revenue Code of 1954 (26 U.S.C. § 501(c)(13)) which allows an exemption for:

"(13) Cemetery companies owned and operated exclusively for the benefit of their members or which are not operated for profit; and any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual."

The District Court without a jury tried the case on stipulated facts and found that Taxpayer failed to meet any of the requirements of the tests for exemption under the statute and entered a judgment in favor of the Government. Taxpayer limits its appeal to the last-mentioned exemption, following the semico-

lon, in subsection (13) of the statute above set forth.

The facts as stipulated show that Taxpayer, a Texas corporation, organized in 1953 as a nonprofit lot owners association, owns and operates a perpetual care cemetery. One of the original incorporators, George Young, was the former president, general manager and virtual owner of Realty Development Corporation [Realty], a profit cemetery corporation, which was the predecessor to Taxpayer. Young sold his stock in Realty to Taxpayer in consideration of the sum of $1,482,000, evidenced by a note in that amount payable in semiannual installments, final payment on which was made in January 1972. Assets of the predecessor corporation included 190.154 acres of land, developed but unsold grave sites, improvements including a mausoleum, and accounts receivable in the approximate amount of $1,000,000. Taxpayer owned no assets prior to the transfer, but presently owns all of the outstanding stock of its predecessor, and its cemetery consists of approximately 285 acres, the result of three additional subsequent transfers of land from Young in 1954, 1961 and 1965.

The District Court's findings of a prohibited inurement under Section 501(c)(13) of the Internal Revenue Code of 1954 are predicated on the three following sets of circumstances: 1) the 1954, 1961 and 1965 land conveyances from Young, the consideration for which was a certain percentage of the gross receipts from future sales of lots and improvements thereon, as contrasted to a fixed sum; 2) the close relationship, interlocking management, directorship and ownership existing between Taxpayer and other related entities, including a funeral home, life insurance company and a trust company; and 3) allowance of personal expenses and other benefits by Taxpayer to Young and its executive officers.

We agree that the interrelation of these three features constitute prohibited inurement to the benefit of a private individual under Section 501(c)(13) thus precluding tax-exempt status for Taxpayer.

1. *The land conveyances.*

In 1954 and 1961 Taxpayer acquired from Young and his wife 11.343 and 104.677 acres of land, respectively, adjacent to the cemetery, for which Taxpayer agreed to pay Young 20 per cent of the gross receipts from future sales of grave spaces, plus 10 per cent of the gross receipts from future sales of niches and crypts on the property acquired under the agreements.[1] No maximum price was determined, but minimum annual payments after a certain number of years were required under the agreements. These minimum payments have not been made to date, Young having agreed to delays as they became due. A third contract was executed in 1965 by which Taxpayer acquired an additional 25 acres of land which Young had placed in trust for his daughter in 1964, for which Taxpayer agreed to pay to the trust 15 per cent of the gross receipts from future sales of property. Similar to the two prior contracts, there was no fixed price but a required minimum payment. In each instance, shortly after the properties were acquired, Taxpayer had them dedicated for cemetery purposes.

---

1. By separate agreement the parties provided for a division of condemnation proceeds between Restland and Young as well as for reconveyance to Young of any land made no longer suitable for development for cemetery purposes. As the result of a subsequent purchase of 20 acres from Taxpayer by the County of Dallas and the State of Texas for a right-of-way, 25 acres of Taxpayer's land were cut off from its remaining property. The parties divided the proceeds of the sale, approximately $600,000, and the 25-acre tract was then declared by the directors as unsuitable for cemetery purposes and reconveyed to Young and his wife for no additional consideration.

2. *The relationship between Taxpayer and other associated entities controlled by Taxpayer and its executive director.*

   a. *Restland Funeral Home, Inc.*

In 1956 Taxpayer sold 2.356 acres of formerly dedicated cemetery land to Young for $10,165. Young then formed a profit corporation, Restland Funeral Home, Inc., of which he was the sole shareholder, for the purpose of constructing a mortuary adjacent to the cemetery. Taxpayer entered into an agreement with Young to lease space in the funeral home, which lease was in turn pledged as collateral in obtaining a loan for the construction of the building. Young is president of Restland Funeral Home, Inc. Its vice-president and secretary-treasurer, C. H. Shackelford and Harry Thompson, respectively, are also officers of Taxpayer corporation—Shackelford as vice-president, and Thompson as vice-president-secretary. Taxpayer shares certain joint expenses with the funeral home including overhead, advertising charges and salaries. Taxpayer does not charge the funeral home the usual $25 fee which it charges other funeral homes for the use of its cemetery chapels. Taxpayer maintains office space and operates a flower shop and memorial salesroom within the building. Sixty-four per cent of the funerals held in Taxpayer's cemetery come from Restland Funeral Home. Salesmen for Taxpayer also arrange for some pre-need funerals for the funeral home. The funeral home and Taxpayer hold themselves out to the public as offering all funeral-related services at one place. This package-plan arrangement was at one time advertised with the slogan, "One call does all." The family of the deceased receives one bill covering such items and services as a lot, memorial, flowers, vault and the funeral service. Another cemetery and mortuary, Laurel Land Memorial Park and Funeral Home, operates as a subsidiary of Restland Funeral Home, Inc. Young, Shackelford and Thompson serve as officers thereof. As executive director of Taxpayer, Young sets his own salary. He also selects the members of Taxpayer's Board of Directors. Lot owners are required by contract to relinquish their proxies to Young to vote at meetings of Taxpayer.

   b. *Other entities controlled by Taxpayer and its executive director.*

Young is also the virtual owner and president of three additional companies whose operations are interrelated with those of Taxpayer—Restland Life Insurance Company, Restland Investment Company and American Trust Company.

The primary purpose of the insurance company is to insure the unpaid balance on funeral trust accounts. A family purchases a casket and funeral services; the seller of the funeral puts 90 per cent of the funds in trust. These sales are made on a time-payment installment basis. In order to assure that the entire amount would be paid in the event of the death of the purchaser, the unpaid balance is covered by the insurance company. The investment company was chartered as a profit company for the purpose of selling debentures of Taxpayer. Pre-need funerals were funded by the debentures which mature on the death of the purchaser, or in twenty years. The trust company serves as a vehicle for the investment of perpetual care funds. It has no assets of its own and its stock is presently worthless.

3. *Personal expenses and other benefits inuring from Taxpayer to its officers.*

Taxpayer provides Young, Shackelford and Thompson with automobiles which are replaced every three years. These vehicles are also used in the business of the related entities. Taxpayer pays for membership dues and all of Young's expenses at the Northwood Country Club, including entertainment, food and beverages for himself and his wife. The same is true in regard to Lock and Key Club and the Dallas Club. Taxpayer also pays membership dues for Shackelford at the Northwood Country Club and the Chaparral Club. Group memberships in

other organizations for the purpose of entertaining out-of-town visitors are also maintained by Taxpayer, such as the Rafters Club, Dominique's Restaurant, and the Commonwealth Club. Young, Shackelford and Thompson receive salaries from both Taxpayer and Restland Funeral Home.

The District Court held that the percentage-of-sales agreements were not permissible sales under section 501(c)(13) and were in effect contributions to capital. We agree with the District Court's conclusion as well as with its observation that the decision of Rose Hills Memorial Park Association v. United States, 1972, 463 F.2d 425, 199 Ct.Cl. 6, is directly in point. For all intents and purposes the cases are virtually indistinguishable. Rose Hills involved a percentage-of-sales arrangement similar to the instant one. The predecessor, for-profit corporation, from which the cemetery corporation acquired its land, sold all of its outstanding stock to the nonprofit cemetery corporation and received in consideration therefor a promise to pay: 30 per cent of the gross selling price of grave sites sold from the property; 10 per cent of sales of mausoleums, niches, and crypts; 20 and 25 per cent of sales of various underground crypts; 50 per cent of rents and royalties received for the use of real property; and on sales of real property under any other circumstances, during the first five years, 90 per cent of the proceeds; during the following ten years, 80 per cent, and thereafter, 75 per cent. The Court of Claims found that the substance of the transaction resembled an equity interest because all the traditional elements of a valid debt were missing. These elements were enumerated as follows: No unqualified obligation on taxpayer to pay; no maturity date; no sum certain; no stated interest rate; no minimum annual payment; no right of the creditor to share with general creditors and no paid-in capitalization

to the business. The court also found complete control by transferors over the cemetery's operations evidencing an equity interest. 463 F.2d at 431. An application of these factors to the present case indicates that the debtor-creditor relationship is lacking here as well. There is no stated interest. There is neither maturity date nor sum certain, as the amount to be received by Young is wholly dependent upon the number of lots and graves sold. Although minimum annual payments were required by the three percentage-of-sales contracts, the payments provided for in the 1954 and 1961 contracts were never made, having been deferred by Young as they became due. The right of the "creditor" (Young and his family) to share with general creditors is meaningless inasmuch as there is nothing in the record to indicate that Taxpayer has borrowed funds. The only assets received by Taxpayer came from the Young family. The initial capitalization of Taxpayer, a mere $500, is negligible in comparison to its original debt obligation to Young of almost $1,500,000.

The identical issue—whether funds advanced to a business corporation are in substance debt or equity—has arisen many times in this Court in other areas of federal income tax law.[2] Consequently certain guidelines have evolved over the years in resolving the debt-equity question. These are in substance the same as those listed in Rose Hills. Other factors which we have considered are the names given to the instruments evidencing indebtedness, the intent of the parties, and the identity of interest between creditor and stockholder.[3] Here, of course, the "creditor" is in essence the "stockholder." Thus the interest of the parties, their alleged intent to enter into sales agreements with resultant debts, and the fact that the instruments are on their face sale transactions, have little if any significance. Balancing these fac-

2. See, e. g., Du Gro Frozen Foods, Inc. v. United States, 5 Cir., 1973, 481 F.2d 1271; Plantation Patterns, Inc. v. C. I. R., 5 Cir., 1972, 462 F.2d 712; Estate of Mixon v. United States, 5 Cir., 1972, 464 F.2d 394, and numerous cases cited therein at 398 n. 1.

3. See Estate of Mixon v. United States, 5 Cir., 1972, 464 F.2d 394, 402.

tors we find a clear preponderance in favor of an equity interest.[4]

Appellant, relying on C. I. R. v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965), attempts to distinguish *Rose Hills* on the ground that the percentages in Restland's acquisitions are fair and reasonable, being substantially lower than those used in the *Rose Hills* transaction, and also for the reason that the original assets of Restland were acquired for a fixed price whereas all of the assets of *Rose Hills* were acquired on a percentage-of-sales basis. We cannot agree that these variations in percentages and in the number of such agreements used are material in determining whether or not the transactions created an equity interest in Taxpayer in contrast to a debt. Nor are we convinced of any great disparity between the overall facts of the cases which would characterize the arrangements here fair and reasonable in contrast to those in *Rose Hills.* Underlying that decision, and perhaps the most relevant factor here, is the substantial control exercised by transferor over transferee Taxpayer and the almost inseparable identity of the two. Except for the contemplated change in the tax structure (from a for-profit corporation to an exempt nonprofit one) the Restland cemetery operation was the same operation, under the same control and management, after the transfer as it was before. The record is replete with evidence of Young's control over Taxpayer, as shown for example by his uncontested authority to select board members, and to vote at all meetings as proxy for all lot-owner members.

C. I. R. v. Brown, *supra,* relied on by appellant, is inapposite. There the Supreme Court upheld as valid the sale of a business concern to an exempt charitable organization despite the fact that the purchase price (less a deduction for a nominal downpayment) was payable only from the income which would be produced by the business sold. The Court noted with approval that the Tax Court had found the price was within reasonable limits as a result of good-faith bargaining at arm's length. 380 U.S. at 569, 85 S.Ct. at 1165. However, unlike the present case and that of *Rose Hills,* the agreement in *Brown* between taxpayer and the transferor called for a fixed price to be paid within a fixed period of time. 380 U.S. at 567, 85 S.Ct. at 1164. Rose Hill Memorial Park, Inc., 23 T.C.M. 1434 (1964) (C.C.H.),[5] and Washington Park Cemetery Association, Inc., 22 T.C.M. 1345 (1963) (C.C.H.), also relied on by Taxpayer, contrary to appellant's contentions, are cases involving fixed prices. In holding that no net earnings inured to private interests, the Tax Court in *Rose Hill* used as a predicate the fact that "The purchase price was fixed and was not dependent upon the proceeds realized from the sale of individual lots." 23 T.C.M. at 1438 (C.C.H.). Likewise, in *Washington Park* the Tax Court found that "the purchase price was a fixed amount, as opposed to an indefinite purchase price." 22 T.C.M. at 1360 (C.C.H.). In contrast to the three aforementioned

---

4. The District Court also cited Knollwood Memorial Gardens v. Commissioner, 1966, 46 T.C. 764, as authority for its holding. As in *Rose Hills*, factors evidencing debt or equity characteristics were explored. The court said:

> "Not only does petitioner's obligation lack the principal elements of debt, but the interests of the landshare holders evidence the principal characteristics of equity interests. Petitioner was an empty shell without capital or assets of any kind before it acquired Petitjean's land and promise to begin development. Of primary importance is the fact that the ultimate receipt of payment by the landshare holders is complete-

ly dependent upon sales by the alleged 'debtor'; the sole obligation petitioner had to Petitjean and his transferees was at the risk of its cemetery operation; sales proceeds are the sole source for payment to these landshare holders and in the absence of sales, payments could not be made. This arrangement embodies the very essence of an equity interest, 'a participation in the pot luck of the enterprise.'"

5. This case should not be confused with Rose Hills Memorial Park Association v. United States, 1972, 463 F.2d 425, 199 Ct.Cl. 6, *supra.*

**192**

cases relied on by appellant, the price payable to the transferor here has neither been determined nor is it capable of determination, thus lacking the characteristics of a true sale, and at the same time providing for the possibility of tremendous financial gain to a private individual. Thus "charity becomes too intertwined with promotion" to permit a tax exemption. Evergreen Cemetery Ass'n of Seattle v. United States, 9 Cir., 1971, 444 F.2d 1232, 1235.

Finally, appellant contends that the decision of the District Judge holds that the acquisition of land by a cemetery under a percentage-of-sales agreement constitutes in itself a sufficient ground for denying the cemetery's exemption under the statute, thus creating a per se rule contrary to the opinion in *Rose Hills*[6] on which the District Judge relied. We do not agree with that interpretation. It is obvious that the District Judge was incorporating the reasoning in *Rose Hills* in relying on that decision.[7] The percentage-of-sales character of the arrangements was an important element, but only one of several factors considered by the District Judge in denying the exemption and considered by us in upholding that denial.

We fully agree that the 1954, 1961 and 1965 percentage-of-sales agreements, under the particular circumstances of this case, were in effect contributions to capital. When this type of agreement is considered in conjunction with other factors present heretofore discussed, we cannot escape the conclusion that the land transfers were not sales but contributions to capital, and that part of the net earnings of the corporation are inuring to the benefit of the investor.

Affirmed.

**6.** The Court of Claims in *Rose Hills* said:
    "We do not mean, by our decision today, to hold that the percentage-of-sales agreement is, *per se,* a violation of § 501(c)(13). . . . We only hold that, on the basis of the situation before us, a contribution to capital was made instead of a sale and consequently net earnings of the corporation wound up in individuals' hands in violation of § 501(c)(13)."

**7.** In a somewhat brief explanation of its reliance on *Rose Hills*, the District Court stated,

after discussing the percentage-of-sales type of agreement, that the exemption in *Rose Hills* was denied "because such a purported sale of land is really a contribution to capital. The seller in these instances retains what amounts to an equity in the land." Taken out of context, the statement arguably lends some support to appellant's impression that a per se rule has been established. However, the District Judge's footnote referral to the *Rose Hills* case "for a full exposition of the reasoning behind these decisions" should dispel this impression.