JAY H. BRAMSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentBramson v. CommissionerDocket No. 10895-84.United States Tax CourtT.C. Memo 1986-273; 1986 Tax Ct. Memo LEXIS 334; 51 T.C.M. (CCH) 1343; T.C.M. (RIA) 86273; July 3, 1986. Robert D. Wilson and Harold Wilson, for the petitioner. Grant A. Wolfe, for the respondent. WILLIAMSMEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined a deficiency in petitioner's Federal income tax for the taxable year ended December 31, 1980 in the amount of $10,696.12 and an addition to tax*335 pursuant to section 6653(a)1 in the amount of $534.81. This Court must decide (1) whether petitioner conveyed eight parcels of real property to Zion Memorial Park Association on December 8, 1980 as a charitable contribution within the meaning of section 170(c)(5), and, if so, the fair market value of the contribution; (2) whether petitioner made miscellaneous charitable contributions of $700 of personal property in 1980; and (3) whether any part of the deficiency for 1980 is attributable to petitioner's negligent or intentional disregard of applicable rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner, Jay H. Bramson, resided in Lyndhurst, Ohio when his petition was filed. In 1980 Zion Memorial Park Association ("Zion") operated as a cemetery association. Zion obtained recognition as a tax exempt cemetery association within the meaning of the predecessor section of 501(c)(13) on August 12, 1953. At all times from August 12, 1953 through 1980, Zion was recognized as a tax exempt organization*336 by respondent and was listed in the published list of tax exempt organizations (Internal Revenue Service Publication No. 78). Respondent has not revoked or proposed the revocation of his recognition of Zion's exempt status for 1980. Petitioner has been employed by Zion since 1954 and has been its president and chief operating officer since 1956. Since August 21, 1953 the majority of the members of the Board of Trustees of Zion have been family members or relatives of the petitioner. Petitioner also has been a member of Zion's Board of Trustees since 1956. As president and chief operating officer of Zion and as a member of the Board of Trustees, petitioner's duties included presiding at all meetings of Zion's members and trustees, signing the records of the meetings, directing the affairs and operations of Zion, and performing such further duties as the trustees may have required from time to time. In addition, petitioner signed all deeds or certificates of ownership; served as the agent upon whom process, tax notices and demands against Zion were served; negotiated contracts; supervised purchases, hiring, and the layout of new sections of roadways on the cemetery premises; filled*337 in for absent employees; attended interments; interacted with undertakers; supervised the erection of monuments, and supervised office functions. In 1980 Evergreen Memorial Park Association ("Evergreen") operated as a cemetery association. Evergreen obtained recognition as a tax exempt cemetery organization within the meaning of the predecessor section of section 501(c)(13) on August 6, 1953. At all times from August 6, 1953 through 1980 Evergreen was recognized as a tax exempt organization by respondent and was listed in the published list of tax-exempt organizations (Internal Revenue Service Publication No. 78). On July 11, 1983, respondent revoked his recognition of Evergreen's tax exempt status effective January 1, 1978 on the ground that part of Evergreen's net earnings inured to petitioner's benefit in the taxable years 1978, 1979 and 1980 in the form of excessive salaries and non-interest bearing unsecured loans. Petitioner has been employed with Evergreen since 1954 and has been its chief operating officer since 1957. Since August 6, 1953 the majority of the members of the Board of Trustees of Evergreen have been family members or relatives of petitioner. Petitioner*338 has also been a member of the Board of Trustees of Evergreen since 1957. As chief operating officer and a member of the Board of Trustees, petitioner performed much the same functions for Evergreen as he performed for Zion. Petitioner has been employed by Hawkins Trading Company ("Hawkins") since 1954. Since 1958 he has served as Hawkins' president and chief executive officer. Hawkins' business from 1959 to the present has consisted primarily of the sale and maintenance of real property. In 1980 petitioner owned 50 percent of the authorized and issued common stock of Hawkins. In 1980 Zion, Evergreen and Hawkins shared a secretary/bookkeeper and an office located at 2103 St. Clair Avenue, Cleveland, Ohio, an arrangement that had existed since approximately 1956. Hawkins owned the building in which the office was located and paid for its maintenance. In 1980 Zion paid Hawkins $1,200.00 in rent for the use of the office. Celeste Wells served as secretary and bookkeeper for Evergreen for approximately 20 years and for Zion for approximately 18 years until her retirement in September 1985. She also worked for Hawkins but after 1970 the volume of work was negligible, and she*339 stopped drawing a salary from Hawkins. After 1970 Wells drew one-third of her salary from Zion and two thirds from Evergreen because Evergreen generated a significantly larger volume of work. While Wells worked at the office at 2103 St. Clair Avenue, she lived in Cleveland. She would not have worked for Zion if the office had been on the cemetery premises. In 1980 Zion maintained two offices, a very small one at the cemetery and the other at 2103 St. Clair Avenue in Cleveland. Zion stored one set of cemetery plats at the office on the cemetery grounds, and the wife of one of the employees answered the telephone. Zion maintained the downtown office because it was easier to find a secretary/bookkeeper to work there and because it was necessary to store a second set of cemetery plats there. Instead of paying petitioner a salary from 1954-1968, Zion used the funds to expand the cemetery. Subsequently, petitioner began to draw a salary of $4,000.00 per year from Zion. At the suggestion of an accountant, in the early 1970's petitioner's salary was terminated, and instead Zion paid a management fee to Evergreen which paid petitioner a salary for his work at both cemeteries. Forty*340 percent of the salary petitioner received from Evergreen represented compensation for services rendered for Zion and 60 percent represented compensation for services rendered on behalf of Evergreen, corresponding to the approximate percentage of time that petitioner devoted to each cemetery. In 1980 Zion paid Evergreen a management fee of $39,000.00. Although Zion is a small cemetery, the scope of its operations is not insignificant. At the close of 1980 Zion had net assets, including land, stocks, bonds, an endowed care trust fund and bank accounts in excess of $1,000,000.00. Zion's total income for 1980 was approximately $115,000.00 and its total expenses, including the management fee to Evergreen, were approximately $112,000.00. Given the scope of Zion's operations in 1980, $39,000.00 is a reasonable expense for management of operations and assets. Zion has charge accounts only with its major suppliers. Incidental expenses such as pick shovels, small amounts of sod, grass seed, fertilizer, hardware and supplies for the residences of the employees were paid for by petitioner who was reimbursed by Zion for the exact amount of the expenses at the end of the month. Wells, the*341 bookkeeper, never reimbursed anyone without a bill or receipt. When petitioner charged items for Zion on his personal credit cards, Wells would write a check on Zion's account to the credit card company for the amount of the bills petitioner presented and would pay the remainder of the credit card bill from petitioner's personal account. In 1980, petitioner incurred expenses on behalf of Zion for miscellaneous supplies. In addition, petitioner occasionally took funeral directors to lunch and his employees to dinner if they had to work late. When a member of the funeral director's family passed away, petitioner also purchased a wreath for $35 or $40. Unlike Zion, Hawkins Trading Company had extensive credit. On one occasion, Hawkins advanced credit to Zion for carpeting at Zion Memorial Park. Hawkins ordered the carpeting because it had established credit with the carpet company and was entitled to a discount. Zion directly paid the bill for the carpeting and thereby received the benefit of Hawkins' discount. Zion also made four other payments on Hawkins' account in 1980: DatePayeeAmountExplanation8/20/80The Higbee Co.$24.13Office expense9/05/80I.B.M. Co.108.29Office expense10/14/80Sunmark Industries393.32Gasoline12/29/80The Higbee Co.36.41Office expense*342 We find these amounts to be Zion's expenses. Petitioner is a real estate investor and has purchased and sold real estate for himself and members of his family. Between 1976 and 1980 petitioner donated unimproved property to several charitable organizations and governmental entities. During the period 1963 through 1980, petitioner and members of his family donated numerous parcels of real property to Zion. On December 8, 1980, petitioner donated eight parcels of unimproved property located in Cuyahoga County, Ohio to Zion and claimed a deduction of $27,500 for the donation as a charitable contribution. Respondent determined that petitioner had significantly overstated the value of the properties. The chart below sets forth the fair market values of the donated properties as claimed by petitioner and as determined by respondent: Cuyahoga County OhioFMV ClaimedFMV DeterminedPermanent Parcel Numberby Petitionerby RespondentA. 108-28-005$ 4,000.00$1,000.00B. 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,000.002,600.00C. 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,000.001,850.00D. 795-07-120, 121, 1227,500.001,000.00E. 795-08-046, 0484,000.000.00Total$27,500.00$6,450.00*343 In 1980 Permanent Parcel Number 108-28-005 ("Property A") was a 30' X 90' unimproved parcel with access to public utilities. Property A was zoned commercial, a designation that permits both commercial and residential uses, and was located on the westerly side of East 108th Street, South of St. Clair Avenue, in the northeast section of Cleveland, Ohio. The surrounding neighborhood on December 8, 1980, was an area of both residential and commercial uses. The neighborhood was fully developed and in a state of declining growth. Property A had no viable commercial use. Due to the dimensions of Property A, the proximity of adjacent buildings, and the proximity restraints imposed on residential use property under the Cleveland zoning laws, the types of residential improvements that could be built on Property A were significantly restricted. We find the fair market value of Property A to be $1,000 on December 8, 1980. In 1980 Permanent Parcel Number 142-17-212 ("Property B") was a 30' X 15' unimproved parcel with access to public utilities. Property B is zoned for residential use and located on the south side of Ohio Avenue, on the south side of Cleveland, Ohio. In 1980 the immediate*344 area was residential but large tracts of property adjacent to Property B were zoned and developed for industrial use. We find the fair market value of Property B to be $2,600 on December 8, 1980. In 1980 Permanent Parcel Number 361-17-029 ("Property C"), an approximately 60' X 66' unimproved parcel with access to public utilities, was zoned single family residential and was located on the westerly side of Wesley Drive in the City of Berea, Ohio. All of the surrounding properties had been developed for residential use. We find the fair market value of Property C to be $1,850 on December 8, 1980. In 1980 Permanent Parcel Numbers 795-07-120, 121 and 122 ("Property D") and Permanent Parcel Numbers 795-08-046 and 048 ("Property E") were unimproved parcels located in the northern part of Oakwood Village, Ohio. The village had not installed any public improvements to serve Property D or Property E. All of the subject parcels were in an area zoned residential. The immediate area was only partially developed with a mixture of older and newer residential construction. Property D comprises three adjacent parcels identical in size. Property D is rectangular with dimensions of 120' X*345 150' located on the west side of Northam Drive between Booker Avenue and Suwanee Avenue, an undeveloped area. We find the fair market value of Property D to be $1,000 on December 8, 1980. Property E consists of two parcels of unimproved land, each measuring 40' X 125'. The parcels are not contiguous. Property E is located on the northerly side of Suwanne Avenue west of Lawson Road and east of Kentucky Drive, and as of January 1986, Suwanee Avenue at the sight of the subject properties had not been developed. We find Property E to have had a nominal $10 value on December 8, 1980. Petitioner claims to have made several other noncash charitable contributions in 1980 for which he claimed deductions totaling $700.00. Included in this amount were several miscellaneous items donated to the Salvation Army, the fair market value of which was claimed to be $150.00. The receipt for these items was made out to "Mrs. Simon" at "24728 Letchworth, Beachwood       44122." Mrs. Simon was petitioner's mother-in-law, and the zip code 44122 is a location in Ohio. We find that petitioner's mother-in-law donated the personal property and not on petitioner's behalf. Another donation that*346 petitioner claims that his mother-in-law made on his behalf was a recliner and two chairs to the Volunteers of America which he valued at $150.00. The date on the receipt for this donation is April 19, 1978. We find that petitioner did not make the claimed donation to Volunteers of America and that the donation was made in 1978. Petitioner also claimed a deduction for a foosball 2 table donated to the City of Ithaca, New York. Petitioner purchased the table for $895.00 and claimed it had a value of $400.00 when donated. The receipt for the donation is dated May 23, 1980. OPINION The first issue for decision is whether petitioner's conveyance of eight parcels of real estate to Zion in 1980 constituted a contribution or gift to or for the use of a cemetery company within the meaning of section 170(c)(5). Respondent contends that Zion was not in 1980 a cemetery company within the meaning of section 170(c)(5) because petitioner used Zion for his personal enrichment. The statute prohibits inurement to a*347 private shareholder or individual. Petitioner's contribution to Zion will not be deductible if any part of Zion's net earnings inured to petitioner for his private benefit. Payment of an unreasonable or excessive salary to an officer of a nonprofit corporation constitutes inurement, Knollwood Memorial Gardens v. Commissioner,46 T.C. 764, 787 (1966), as does payment of unreasonable rents, Texas Trade School v. Commissioner,30 T.C. 642, 647 (1958), affd. per curiam 272 F.2d 168 (5th Cir. 1959), and the payment of personal expenses of an officer of the exempt organization. Restland Memorial Park of Dallas v. United States,509 F.2d 187, 189 (5th Cir. 1975). 3 An important criterion for determining whether payments are unreasonable is whether the exempt organization could obtain the same services more cheaply from an outside source. Cf. B.H.W. Anesthesia Foundation, Inc. v. Commissioner,72 T.C. 681, 686 (1979). *348 Respondent contends that certain payments that Zion made in 1980 resulted in inurement of net earnings to petitioner for his private benefit. The payments at issue are Zion's payment of a management fee to Evergreen for services petitioner rendered to Zion; Zion's payment of a portion of petitioner's credit card bills and of certain expenses billed directly to Hawkins; and Zion's payment of rent to Hawkins. We believe that petitioner has carried his burden of proof to explain each of these payments. In so holding, we have relied heavily on the testimony of Celeste Wells, the retired bookkeeper of Zion. Her testimony was straightforward, confident and unblemished by respondent's cross-examination. The management fee paid to Evergreen represented compensation for services actually rendered to Zion and on this record the amount appears to be reasonable. 4*349 Zion's payment of a portion of petitioner's credit card bills did not constitute inurement but reimbursement for expenses he incurred on behalf of Zion. Similarly Zion's payment of a bill on Hawkins' account in 1980 was for the purchase of carpeting used by Zion. 5 Zion paid $1,200.00 in rent in 1980 for the office that it shared with Evergreen and Hawkins. On this record that amount appears to be reasonable. Petitioner is, therefore, entitled to a deduction under section 170(c)(5) for his contributions of real property to Zion in 1980. Consequently, we must determine the fair market value of the properties contributed. Fair market value is the price at which property would change hands between a willing seller and a willing buyer, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. See section 1.170A-1(c)(2), Income Tax Regs. We hold that petitioner has not*350 carried his burden of proof. Welch v. Helvering,290 U.S. 111, 112 (1933). To estimate the value of unimproved properties, appraisers most frequently rely on the comparable sales method of valuation. The comparable sales approach produces an estimation of value by comparing the subject property to similar properties that recently have been sold in the vicinity. The reliability of the comparable sales method depends on several factors, including the availability of verifiable comparable sales data and the degree of comparability of the properties. Wayne Levering, a professional appraiser, valued the subject properties for petitioner as of December 8, 1980. As to each parcel of property, we find that Levering's practices were cursory, unreliable, and inaccurate. Levering used properties that were not in fact comparable to value the subject properties and as a result significantly overstated their values. He relied on sales of commercially zoned properties as comparable sales data to value property zoned for residential use and sales of residentially zoned properties to value property zoned for commercial use. He used sales of properties in a generally well-maintained*351 neighborhood to value a parcel in declining neighborhood. Moreover, he listed some supposedly comparable properties as unimproved which in fact had been improved as of the comparable valuation date and significantly overstated the size of Property C because he had not examined the deed. Respondent's appraiser, Gregory Zivoder, provided forthright and reliable evaluations of fair market value for the subject parcels, and we accept his findings. Specifically with regard to our finding that Property E had only minimal value as of December 8, 1980, it appears that the only verified sales of unimproved property in the immediate area between 1972 and 1982 were condemnation or sheriff's sales for taxes owed. Although a sheriff's sale is a distress sale and is, generally, not a reliable indicator of fair market value, in the case of Property E, the sheriff's sales are the only sales of comparable properties in the area. Zivoder relied on sheriff's sales of improved properties as comparable sales and because Property E was unimproved, subtracted the cost of improvements from the average sale price of the comparable properties. The cost of improvements exceeded the price anyone was willing*352 to pay in 1980 for the right to carry the taxes on the comparable properties. Thus, Zivoder appraised Property E as having no fair market value as of the valuation date. Since we are not persuaded that the full cost of improvements should be subtracted from the sheriff's sale price to determine Property E's fair market value, we find that Property E had some value which we find to be $10. The second issue is whether petitioner has substantiated $700.00 in miscellaneous contributions for which he claimed deductions on his 1980 joint Federal income tax return. Harris v. Commissioner,745 F.2d 378, 379 (6th Cir. 1984). We find that he has not. Petitioner claimed deductions in 1980 for (1) miscellaneous items that were donated to the Salvation Army and valued at $150.00; (2) a recliner and two chairs that were donated to the Volunteers of America and valued at $150.00; and (3) a foosball table that petitioner donated to the City of Ithaca and valued at $400.00. The receipts that petitioner submitted to substantiate his donations to the Salvation Army and the Volunteers of America, however, were issued to petitioner's mother-in-law. The date on the Volunteers of*353 America receipt is September 19, 1978. Petitioner did not specifically testify as to the date he donated the foosball table to the City of Ithaca, and the receipt does not state when the foosball table was received. 6 We therefore hold that petitioner has not sustained his burden of proof that he made any of these contributions in 1980. Finally, we decide that petitioner is liable for the addition to tax under section 6653(a) for negligence or intentional disregard*354 of rules and regulations. Respondent's determination of negligence or intentional disregard of rules and regulations is prima facie correct and petitioner bears the burden of proof to the contrary. Bixby v. Commissioner,58 T.C. 757 (1972). Petitioner has not shown that he acted reasonably and prudently and exercised due care in obtaining appraisals of fair market value for the property he donated to Zion and in claiming deductions for donations to other organizations in 1980. See Neely v. Commissioner,85 T.C. 934, 947-48 (1985). To determine the value of the real property he donated to Zion in 1980, petitioner relied on an appraisal report prepared by Wayne Levering. Levering had done appraisals of petitioner's donated properties in previous years and, on at least one occasion, had shown his work to be unreiable. 7 We believe that petitioner should have inquired into the comparable properties that Levering selected for the appraisals. Had he done so, petitioner would have seen that the values were significantly overstated. Moreover, as an experienced*355 real estate investor in the Cleveland area, petitioner can be expected to have a better than average knowledge of land values in the area. Petitioner is a sophisticated business man who, we believe, knew that he was overstating the value of his claimed deductions. Finally, as to the miscellaneous personal deductions, we believe petitioner knew, for the donations to the Volunteers of America and to the Salvation Army, that he had not made them. Petitioner was negligent in claiming the amount of the deduction for charitable contributions on his 1980 return. To reflect the foregoing, Decision will be entered under Rule 155.Footnotes1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩2. Foosball is a game played on a table designed to resemble a soccer field. There are handles on the sides with which the players push the ball up and down the field.↩3. Although all of these cases concern eligibility for tax exempt status under section 501(c), the language prohibiting inurement is identical to that in section 170(c)(5)↩.4. On July 11, 1983, the Internal Revenue Service revoked Evergreen's tax exemption effective January 1, 1978, in part because some of Evergreen's net earnings inured to petitioner's benefit in the form of excessive salaries. Evergreen's status was not at issue before the Court, and we do not comment on it. The revocation of Evergreen's tax exemption in 1983, however, is not dispositive of whether Zion paid Evergreen an excessive management fee in 1980.↩5. Based on Wells' testimony, Zion's payment of office expenses and a repair bill charged on a gasoline card was payment of its own expenses.↩6. In response to the question whether he had made any donations of personal property in 1980, petitioner stated generally that he had made donations to the Salvation Army, the Volunteers of America and the City of Ithaca. Given that the receipt from the Salvation Army offered to help substantiate petitioner's contribution was his mother-in-law's and that the receipt offered to help substantiate petitioner's donation to the Volunteers of America bears the date September 19, 1978 (and is also in his mother-in-law's name), we are not inclined to believe that petitioner donated the foosball table in 1980 without more specific evidence of when the donation was made and when the City of Ithaca actually received it.↩7. On October 20, 1980, Levering completed a certificate of appraisal for petitioner valuing Permanent Parcel Number 019-14-117 at $10,000.00 as of December 31, 1977. He used several nearby properties as comparable sales. Levering did not physically inspect the parcel or examine the deed. Had he done so, he would have discovered that the City of Cleveland had acquired the property from petitioner in 1964 by eminent domain and that as of the valuation date it was part of an interstate highway.↩